**No. 26-3857**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

JEFFREY MOFFATT,
Defendant-Apellant.

On appeal from the United States District Court
For the Central District of California
2:21-CR-00335-JAK
Hon. John A. Kronstadt, Presiding

# APPELLANT'S MOTION TO REMAIN ON RELEASE PENDING APPEAL UNDER F.R.A.P. 9(b)

Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho, 83702
P: (208) 724-2617
chd@fergusondurham.com
*Counsel for Appellant*
**Appellant Not in Custody**

## INTRODUCTION

In 2021, the government indicted Jeffrey Moffatt with five counts of wire fraud, 18 U.S.C. § 1343, and one count of falsifying, concealing, or covering up a material fact to the Social Security Administration by trick, scheme, or device, 18 U.S.C. § 1001(a)(1). D.C. Dkt. 1. The magistrate judge released Moffatt at his initial appearance with a $30,000 bond. D.C. Dkt. 8.

The case would not be tried for another for four years, during which Moffatt remained at liberty in the community without violating his release conditions. He eventually represented himself at his jury trial, which resulted in a hung jury on all wire fraud counts and a guilty verdict on the single count alleging false statements. D.C. Dkt. 379. The district court sentenced him to a year and a day in prison, ordered him to report to the Bureau of Prisons by September 30, 2026, and later denied his request to remain out of custody pending the appeal. D.C. Dkt. 379, 384.

It is undisputed that Moffatt—who is 61 years old with serious chronic medical conditions and zero criminal history—is neither a flight risk nor a danger to the community. The government admitted as much

at his sentencing hearing, conceding that "based on his performance on supervised release, [he] does not pose a flight risk or an imminent danger to the community." Sent. Tr. at 28-29, at D.C. Dkt. 389. Moffatt does not bring this appeal for purposes of delay, and he will raise substantial questions of law or fact that, if decided in his favor, will likely result in reversal. This Court should grant his motion to remain out of custody pending completion of the appeal.[1]

## STANDARD OF LAW

A defendant is eligible for release if the Court finds (1) the defendant does not pose a flight risk or a danger to the community, (2) the appeal is not for purpose of delay, and (3) the appeal will raise a substantial question of law or fact that, if resolved in the defendant's favor, is likely to result in reversal, a new trial, or significant sentencing relief. 18 U.S.C. § 3143(b)(1).

The third requirement appears at first blush to set a demanding standard, akin to showing a likelihood of success on the merits. But this

[1] Attached to this motion are: (1) a declaration of counsel that the trial and sentencing transcripts have already been ordered and filed, which is evidence that the appeal is not for delay, Ex. A; and (2) the district court's written order denying release pending appeal, Ex. B.

Court has taken a less strict view, holding that a defendant satisfies § 3143(b)(1) if his appeal will raise a "fairly debatable" question, and "if error is found[,] reversal is likely." *United States v. Handy*, 761 F.2d 1279, 1283–84 (9th Cir. 1985).

**BACKGROUND**

Jeffrey Moffatt, a lawyer, represented social security claimants before the Social Security Administration (SSA). The government's core theory of this case was that, after the Arizona Supreme Court and other courts had entered orders disbarring Moffatt, he lied when he checked a box on forms that he submitted to the SSA, as part of his representation of claimants, indicating that he had never been disbarred or suspended from the practice of law.

Moffatt vigorously contested the case. Over the course of about four years, several appointed attorneys were replaced by new counsel. The matter was continued numerous times, usually either by stipulation or without objection from the government. *E.g.*, D.C. Dkt. 29, 35, 81, 95, 99, 106. As the case approached trial in 2025, a disagreement arose again between Moffatt and his then appointed counsel. The judge allowed counsel to withdraw but did not appoint new

counsel. D.C. Dkt. 188. Moffatt represented himself from that point forward with standby counsel. D.C. Dkt. 219.

Moffatt filed numerous pretrial motions. *E.g.*, D.C. Dkts. 190, 192, 198 – 209. Among other requests, he sought to introduce evidence related to his traumatic brain injury and other medical conditions that affected his memory and cognition, and he sought to introduce evidence of deficiencies in the Arizona state bar disciplinary process. D.C. Dkt. 202, 209. He also argued that the government had disclosed some 17,000 documents to him the day before the trial. The district court denied all these motions. D.C. Dkt. 277; Trial Tr. at 6.

At trial, the government pursued its theory that Moffatt had lied on the SSA forms about his disbarment status. As to the materiality of the statements, the government's theory was that had Moffatt indicated that he had been disbarred, the SSA would have moved quickly to investigate the matter and, once it found that his disbarment was for "misconduct," it would have precluded him from representing claimants. *See*, *e.g.*, Trial Tr. at 733, 737.

Moffatt's theory of defense can reasonably be summarized as that he lacked the specific intent to defraud or lie when checked the box on

the form and that the misstatement, if it was that, was not a material one. Trial Tr. at 740. That is so, in part, because he was continuing to challenge his disbarment in Arizona in federal court, arguing that it was the product of a political and constitutionally flawed process. *E.g.* Trial Tr. at 746-47. He repeatedly attempted to introduce evidence about the illegitimacy of the disciplinary proceedings in Arizona, which the trial court rebuffed.

And, as the trial progressed, the evidence began to complicate the government's theory as to Moffatt's intent and the materiality of the statements while supporting his theory. There was no evidence, for instance, that Moffatt misrepresented the *underlying claims for benefits* that he put before the SSA. He generally received good results for the claimants. Trial Tr. at 288, 371, 661. There was also no evidence that he received payment for his services beyond what was permitted. Moreover, at all relevant times, Moffatt was still a member in good standing in one jurisdiction, the Court of Appeals for the Federal Circuit. Trial Tr. at 455. Also, the SSA allows qualified non-lawyers to represent claimants; that is, it permits advocates who have

*never* had a law license, calling into question the materiality of whether a lawyer has been suspended or disbarred.

Perhaps most importantly, the SSA learned in 2017 that Arizona had disbarred Moffatt, and yet it moved slowly. It did not conclude its administrative disciplinary proceedings against him (with an appeal) until 2024, meaning that he could practice before the agency until then. Ex. C; Trial Tr. at 435, 450, 502-07. Even though he continued to check the box that he had not been disbarred in paperwork, SSA was *aware* of his disbarment, again undermining the government's insistence on how important—how material—the statement was.

The jury's multiple questions to the district court during its deliberations reflect some of these problems. It asked about the nature of a "wire transmission." D.C. Dkt. 308. It asked whether a petition to obtain approval of a fee for representing a claimant was a "bargain" between Moffatt and the SSA. D.C. Dkt. 309. This alluded to the term "bargain" in the jury instructions related to wire fraud. Dkt. 392, Tr., p. 692. The jury asked for a copy of the statute defining wire fraud. D.C. Dkt. 310. It again inquired whether a petition for payment to the SSA amounted to a "bargain." D.C. Dkt. 311. Moffatt asked the trial court to

define "bargain" for the jury, but it denied that request. Dkt. 394, Tr., p. 813.

Ultimately, the jury was deadlocked on the five wire fraud counts, but it found Moffatt guilty on one count alleging false statements to SSA by trick, scheme, or device. The trial court declared a mistrial as to Counts 1 to 5.

At sentencing, the district court overruled Moffatt's objections to various calculations and sentenced him to 12 months and a day in prison. It later denied his motion for release pending appeal, *see* Ex. B, which he now renews in this Court.

## DISCUSSION

Moffatt meets the standards for release. He clears the first hurdle easily: as the government conceded, and the district court found, he is not a risk of flight and poses no danger to the community. Sent. Tr. at 28-29; Ex B at 3. He has no criminal history. Sent. Tr. at 23. He is 61 years old with chronic and serious medical conditions, including a traumatic brain injury, seizures, and asthma. D.C. Dkt. 365 at 10, Ex. S. He awaited trial while on pretrial release for over four years—and has been out now nearly five years—complying with all conditions. His

offense is non-violent. His sentence is relatively short, and if he reports to prison he is likely to serve that sentence entirely before this appeal is concluded. He brings the appeal in good faith and not for purposes of delay.

He will also raise issues that are substantial, meaning that they are at least fairly debatable and, if the Court finds error, it will likely reverse for a new trial or resentencing.

### A. Trial Errors

#### *1. Exclusion of Evidence Related to Moffatt's Medical Conditions that Could Negate Knowledge and Intent*

In Count 6, the government alleged that Moffatt "knowingly and willfully falsified, concealed, and covered up by trick, scheme, and device, material facts within SSA's jurisdiction, namely" that he had been disbarred from the State Bar of Arizona and other jurisdictions. D.C. Dkt. 1 at 7. The government was required to prove beyond a reasonable doubt, among other elements, that "the falsification or concealment [of a material fact] was knowing and willful." *United States v. White Eagle*, 721 F.3d 1108, 1116 (9th Cir. 2013).

Before trial, the government filed a motion in limine to exclude certain medical records that Moffatt had listed as potential exhibits.

Moffatt argued that he had a traumatic brain injury, frontal lobe damage, and a brain cyst, and that medical records, including a neurological scan and report, were relevant to negate his knowledge and intent to lie. Trial Tr. at 6; D.C. Dkt. 389. The district court granted the government's motion in limine as to the records after concluding that Moffatt needed an expert to present them to the jury. *Id.* at 8. It allowed limited testimony from Moffatt's wife regarding some of her observations about his memory and cognition, but it would not allow her to go beyond that or to mention diagnoses.

These rulings raise at least fairly debatable appellate questions. Moffatt retained a constitutional right to present relevant evidence in support of his theory of defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). Evidence is relevant when it has any tendency to make a disputed fact more or less probable than it would be without that evidence. F.R.E. 401. Evidence showing Moffatt had a major brain injury has a tendency to make his checking a box on a form that he had never been disbarred inadvertent, a mistake, or the result of confusion about his "legitimate" status more probable than without that evidence. It is relevant.

This Court has previously held that when medical records are plain and relevant to the defense, a district court errs in excluding them. *United States v. Blaylock*, 20 F.3d 1458, 1464 (9th Cir. 1994); *cf. United States v. Barajas-Brandt*, 150 Fed. Appx. 658, 659 (9th Cir. 2005) (distinguishing *Blaylock* on the ground that the records in *Blaylock* were written in plain language and could easily be understood). Here, the district court found that the medical terms were so obscure that lay jurors would not understand them without expert testimony. D.C. Dkt. 389, Tr., pp. 7-8. That ruling is dubious, given that Moffatt proffered evidence of brain damage and other neurological abnormalities that should be within the knowledge and experiences of lay people. When combined with his wife's testimony about how his personality changed, and how he had memory and cognition deficits, a juror could easily draw an inference that his brain injuries caused that behavior, even without expert testimony.

If the Court were to rule in Moffatt's favor on this issue, the error would not be harmless. The government below maintained that this was an easy case: that Moffatt lied when he represented to SSA that he had never been disbarred when he, in fact, had been. But it was not so easy

for the government. The jury asked seven questions of the judge while they deliberated and could not come to a unanimous decision as to the wire fraud counts. D.C. Dkts. 308-315. There was evidence that tended to negate the materiality of misrepresentations, including SSA's knowledge of the alleged false fact while it continued to allow Moffatt to practice and process his payments. Also, the use of a "trick, scheme, and device" implies a level of calculated deception that someone with a traumatic brain injury may lack. All Moffatt needed was a reasonable doubt. This evidence could have provided such doubt.

#### *2. The District Court Erred When It Declined to Appoint New Counsel and Required Moffatt to Represent Himself*

Moffatt had several appointed counsel who later withdrew and were replaced. One month before trial was set to begin, Moffatt and his most recently appointed counsel ran into similar issues, and Moffatt requested that counsel withdraw. D.C. Dkt. 188. The district court allowed counsel to withdraw but required Moffatt to either represent himself or hire private counsel. Moffatt noted that he had contacted an attorney who might be interested, but that it would take at least six months for him to get up to speed. The district court allowed for a brief continuance of the trial, but not six months.

The Sixth Amendment right to the assistance of counsel is perhaps the most fundamental constitutional criminal trial right. *Gideon v. Wainwright*, 372 U.S. 335 (1963). Like any other right, it can be waived, but the waiver must be intelligent and voluntary with full knowledge of the dangers of self-representation. *Faretta v. California*, 422 U.S. 806, 820 (1975).

It appears that the district court decided that Moffatt could not work with any appointed counsel, so it declined to appoint another one. Perhaps the district court could have refused to allow the final appointed counsel to withdraw—assuming no irreconcilable conflict—and required Moffatt either to go to trial with that attorney or to intelligently and knowingly waive his right to counsel and represent himself. But here the court allowed withdrawal and left Moffatt without counsel, effectively forcing him to represent himself. That ruling raises substantial questions of law or fact that, if decided in his favor, likely will result in a reversal for a new trial.

### *3. The District Court Erred in Not Granting a Continuance to Give Moffatt a Reasonable Time to Prepare for Trial Once He Was Pro Se*

Moffatt began representing himself in July 2025, about a month before the trial was then set to begin. D.C. Dkt. 188. The district court eventually continued the trial for another six weeks, until October 9. *Id*.

As the parties neared trial, Moffatt filed a motion seeking, in part, a continuance based on the government's late disclosure documents in discovery. D.C. Dkt. 260. The court denied that motion after finding that Moffatt had reasonable access to the discovery. The day before trial, Moffatt renewed the motion requesting, again in part, that the court vacate and reschedule the trial date due to the government's disclosure of some 17,000 digital documents on the eve of trial. D.C. Dkt. 264. The court took the matter up on the first day of trial, again concluding that Moffatt had reasonable access to discovery since he began representing himself. Trial Tr. at 39. This ruling raises substantial questions of law and fact.

A district court's denial of a continuance is reviewed for an abuse of discretion. Reversal is required if "after carefully evaluating all the relevant factors," this Court concludes that "the denial was arbitrary or

unreasonable." *See United States v. Flynt*, 756 F.2d 1352, 1358 (9th Cir. 1985). That is, "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality," violating the defendant's Sixth Amendment right to a fair trial. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

Moffatt's request was reasonable. He had only been representing himself for a matter of weeks, at most. His previous counsel had not shared discovery with him. The government also unloaded an enormous amount of records in an exceptionally short time on the eve of trial. His request for some additional time to review that volume of discovery and to prepare for trial was understandable. True, the case had already been continued for four years. But that also cuts in Moffatt's favor, as another few weeks or a month or two for him to prepare as a self-represented litigant would have been de minimis in comparison.

Moffatt has a strong appellate argument that the court's denial of his request was "a myopic insistence upon expeditiousness in the face of a justifiable request for delay." *Ungar*, 376 U.S. at 589.

#### 4. *The district court's exclusion of all evidence related to the Arizona disciplinary process violated Moffatt's right to present a complete defense*

The district court granted the government's motion in limine to exclude evidence regarding flaws in the Arizona disciplinary process that led to Moffatt's disbarment. The district court concluded that the only matter that was relevant from that proceeding was the fact of disbarment, not any flaws or disputes that Moffatt had with the process.

This issue also implicates Moffatt's due process right to present a complete defense. Here, the district court's focus was on preventing re-litigation of the underlying bar disciplinary process; that is, it wanted to avoid a trial within a trial and confusion of the issues. But its focus was on the wrong thing. This evidence was relevant because it went to Moffatt's state of mind when he checked the box that he had never been suspended or disbarred. To *him*, the Arizona disciplinary process was constitutionally flawed, and he continued to challenge it in federal court. Evidence as to *why* he sincerely believed that he had not yet been validly disbarred had some tendency to prove his lack of an intent to

deceive. It was therefore relevant. FRE 401. The district court could have used a scalpel rather than a meat cleaver to the extent that it was concerned about confusion or waste of time.

#### *5. The 18 U.S.C. § 1001(b) Safe Harbor*

As held in *United States v. McNeil*, 362 F.3d 570, 572 (9th Cir. 2004), § 1001(b) establishes an absolute statutory safe harbor requiring three elements: (1) a party or counsel in a proceeding; (2) statements submitted to a judge or magistrate in a judicial proceeding; and (3) statements submitted in that proceeding. This has typically been applied to Article III judicial proceedings. *See id*. But Moffatt has a fairly debatable argument that the safe harbor should extend to alleged false statements during administrative adjudicative proceedings in front of an Administrative Law Judge. Congress enacted § 1001(b) to ensure advocates are not criminalized for representative submissions made while advocating before an adjudicator. Prosecuting designated counsel for advocating disclosures submitted directly to an ALJ during active, contested administrative litigation creates the exact chilling effect Congress intended to bar under § 1001(b).

## B. Sentencing Issue

### 1. *The District Court Erred When it Determined the Amount of Loss*

At sentencing the district court calculated the amount of loss at between $95,000 and $150,000 based on the total payments that Moffatt received from SSA during the relevant period. This enhanced the base offense level an additional 8 levels to 14. USSG § 2B1.1(b)(1). Moffatt objected on a number of grounds. D.C. Dkt. 365 at 7-8. The district court overruled the objections.

It is at least fairly debatable whether the district court's calculation of loss was accurate. USSG § 2B1.1(b)(1)(C) defines actual or intended "loss" as "pecuniary harm." Moffat could lawfully practice before the SSA until its final ruling in 2024. There was no evidence before the district court that Moffatt presented false claims for benefits or that he did not render services to the claimants that he represented. He was only paid for a successful result and the award of benefits to the claimant. The claimant received value for the service.

Before an amendment to the guidelines commentary in 2001, this Court had held that in calculating loss the defendant should receive credit for the value of services that he performed satisfactorily. *United States v. Barnes*, 125 F.3d 1287, 1290 (1997) (remanding for

recalculation of loss in a case involving someone who falsely claimed to be a physician). *Barnes* cited a case from the Third Circuit, *United States v. Maurello*, 76 F.3d 1304 (3d Cir. 1996). There, the Third Circuit held that the amount of loss should not include satisfactory services that a disbarred attorney had rendered to clients. *Id*. at 1311-12. The *Maurello* Court wrote "[a] client who obtains satisfactory contract, settlement, or verdict has received something of value, irrespective of whether the lawyer was licensed at the time."

Appellant concedes that in 2001, the Sentencing Commission amended the commentary to USSG § 2B1.1 to read that "[i]n a case involving a scheme in which ... services were fraudulently rendered to the victim by persons falsely posing as licensed professionals ... loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services." USSG § 2B1.1, cmt. n. 3(E)(v). This does not change the result.

First, Moffatt was not "falsely posing as a licensed professional" *as to the SSA paperwork*. He was still in good standing with the Federal Circuit Court of Appeals. He did not lie, then, when he checked the box

on the form indicating that he was a licensed attorney. What the government alleged, and what the jury found, was that he lied about whether he had *ever been disbarred or suspended* by any court. That is a different issue.

The commentary is inapplicable for yet another reason. This Court has held that when the text of the applicable guideline is unambiguous, it must disregard the "interpretive gloss set forth in the guideline's commentary." *United States v. Castillo*, 69 F.4th 648, 650 (9th Cir. 2023) (applying *Kisor v. Wilkie*, ––– U.S. –––– (2019). Here, the text of the guideline defines loss as "pecuniary harm." USSG § 2B1.1(b)(1)(C). Moffatt contends that the text is plain and unambiguous. In cases where services were rendered with a good result, "pecuniary harm" is lacking, or at least the defendant is entitled to some offset for the value of the services. That was the state of affairs before the 2001 amendment to the commentary. If Moffatt were to win this argument on appeal, his total offense level could drop to as low as a level 6, which puts him in a range of 0 to 6 months and eligible for probation.

## CONCLUSION

This Court should grant Jeffrey Moffat's motion to remain on release pending completion of the appeal.

Submitted on this 11th day of August 2026.

/s/Craig H. Durham
Attorney for Appellant

# EXHIBIT A

Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 906-8663
chd@fergusondurham.com
ISB No. 6428

Attorney for Defendant

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff-Appellee<br><br>v.<br><br>JEFFREY MOFFATT,<br><br>Defendant-Appellant. | **DECLARATION OF COUNSEL** |

I, Craig H. Durham, declare under penalty of perjury that the following is true and correct.

1. I am over the age of 18 and competent to testify.

2. The complete trial transcripts in this case have been ordered and prepared. They are filed on the district court's docket at ECF 389 to 394. The sentencing transcript has also been ordered and prepared. It is filed on the district court's docket at ECF 397.

3. On August 7, 2026, I ordered all other pretrial transcripts through the evoucher process for CJA counsel.

4. I submit this certification to show that the appeal is not for purposes of delay. *See* Circuit Rule 9-1.2(b),

EXECUTED on this 11th day of August 2026.

/s/Craig H. Durham
Attorney for Appellant

# EXHIBIT B

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:21-CR-00335-JAK-1 | Date | July 6, 2026 |
| Title | United States v. Jeffrey Moffatt | | |

| | |
|---|---|
| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |

| | |
|---|---|
| M. Lindaya | Not Reported |
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| N/A | N/A |

**Proceedings:** **(IN CHAMBERS) ORDER RE DEFENDANT'S MOTION FOR RELEASE ON BAIL PENDING APPEAL PURSUANT TO 18 U.S.C. § 3143(b) (DKT. 381)**

## I. Introduction

In this action, Jeffrey Moffatt ("Defendant") was charged through an Indictment with five counts of wire fraud, in violation of 18 U.S.C. § 1343 ("Counts 1–5"), and one count of false statements by trick, scheme, or device, in violation of 18 U.S.C. § 1001(a)(1) ("Count 6"). Dkt. 1. On October 15, 2025, following a five-day jury trial, the jury returned a guilty verdict on Count 6. Dkt. 307 at 1. The verdict form stated that the jury was deadlocked as to Counts 1–5. *Id.* at 2. The Government's request that the Court declare a mistrial as to Counts 1–5 was granted. *Id.*

On June 4, 2026, Defendant was sentenced to a term of 12 months and 1 day in the custody of the Bureau of Prisons, one year of supervised release and a special assessment of $100. Dkt. 379 at 1. The Government's motion to dismiss Counts 1–5 was also granted. *Id.* at 2.

At the sentencing hearing, Defendant presented arguments in support of his planned written Motion for Release on Bail Pending Appeal. Dkt. 378. The Government responded orally and elected not to file a written opposition at that time or thereafter. *Id.* On June 9, 2026, Defendant filed the written version of the Motion for Release on Bail Pending Appeal Pursuant to 18 U.S.C. § 3143(b) on the docket. Dkt. 381 ("Motion"). On June 15, 2026, Defendant filed a notice of appeal. Dkt. 383.

In accordance with Local Civil Rule 7-15, which applies in this criminal action pursuant to Local Criminal Rule 57-1, it is determined that the Motion will be decided without further oral argument, and it is taken under submission. For the reasons stated in this Order, the Motion is **DENIED**.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:21-CR-00335-JAK-1 | Date | July 6, 2026 |
| Title | United States v. Jeffrey Moffatt | | |

## II. Analysis

### A. Legal Standards

Section 3143(b) of Title 18 of the United States Code governs release or detention of defendants pending an appeal.[1] Subsection 3143(b)(1) provides that, subject to the exceptions stated in subsection (b)(2), the court:

> shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds—
>
> (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and
>
> (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—
>
> (i) reversal,
> (ii) an order for a new trial,
> (iii) a sentence that does not include a term of imprisonment, or
> (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b)(2) provides the following exceptions:

> The judicial officer shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained.

Under these statutes, a defendant who has been convicted and sentenced shall be detained pending appeal unless the court finds that the two requirements of § 3143(b)(1)(A) and (B) are met. However, if the offense for which defendant is convicted falls within those listed in § 3143(b)(2), then the defendant must be detained pending appeal regardless of whether § 3143(b)(1) has been satisfied.

### B. Application

#### 1. <u>§ 3143(b)(2)</u>

It is undisputed that § 3143(b)(2) does not apply to Defendant. He was convicted of false statements by

[1] 18 U.S.C. § 3143(b) applies when the Defendant is the appellant. When the Government is the appellant, 18 U.S.C. § 3143(c) applies.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:21-CR-00335-JAK-1 | Date | July 6, 2026 |
| Title | United States v. Jeffrey Moffatt | | |

trick, scheme, or device, in violation of 18 U.S.C. § 1001(a)(1). Dkt. 307 at 1. False statement by trick, scheme, or device is not among the list of crimes in § 3142(f)(1)(A) and (C). Further, the maximum sentence for the offense of false statement by trick, scheme, or device is five years. 18 U.S.C. § 1001(a)(3). Accordingly, § 3142(f)(1)(B), which provides an exception for offenses for which the maximum sentence is life imprisonment or death, does not apply.

Because § 3143(b)(2) does not apply, the analysis turns to whether Defendant has satisfied the requirements of § 3143(b)(1).

2. <u>§ 3143(b)(1)(A)</u>

It is undisputed that Defendant does not pose a danger or flight risk under § 3143(b)(1)(A). Dkt. 381 at 2–3. At the sentencing hearing, the Government agreed that Defendant does not pose a flight risk or imminent danger to the community. Accordingly, the first requirement under § 3143(b)(1) is satisfied.

3. <u>§ 3143(b)(1)(B)</u>

a) Legal Standards

Defendant bears the burden to show that his appeal "is not for purpose of delay" and that his appeal raises "a substantial question likely to result in reversal or an order for a new trial." *United States v. Handy*, 761 F.2d 1279, 1280, 1283 (9th Cir. 1985). "'[S]ubstantial' defines the level of merit required in the question raised on appeal, while the phrase 'likely to result in reversal' defines the type of question that must be presented." *Id.* at 1281.

The phrase "substantial question" refers to questions that are "fairly debatable," including "questions that are novel and not readily answerable." *Id.* at 1281–83. A showing that a claim is not frivolous is not sufficient to show a "substantial question." *Id.* at 1283 ("In short, a 'substantial question' is one of *more substance* than would be necessary to a finding that it was not frivolous." (emphasis added) (quoting *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)).

The "likely to result in reversal" inquiry "concerns only the type of question that meets the requirement; it does not involve assessing the likelihood that a reversal will occur in the particular case." *United States v. Baras*, No. 11-CR-523, 2014 WL 4728992, at *3 (N.D. Cal. Sep. 18, 2014) (citing *United States v. Garcia*, 340 F.3d 1013, 1021 n.5 (9th Cir. 2003)). Accordingly, a defendant must show a substantial question that, if decided in the defendant's favor, "would likely result in reversal or could satisfy one of the other conditions" -- "a new trial, a non-prison sentence, or a sentence reduced to less than the time that would be served by the end of the appeal process." *Id.* (quoting *Garcia*, 340 F.3d at 1021 n.5).

b) Compliance with Federal Rule of Criminal Procedure 6

Defendant first contends that the grand jury proceedings that led to the Indictment in this action failed to comply with Federal Rule of Criminal Procedure 6, and that this raises a "highly debatable question of first impression" regarding whether this alleged error requires dismissal of Count 6. Dkt. 381 at 3. Defendant argues that the grand jury proceedings failed to comply with Rule 6 for the following

reasons: (1) they occurred at "an off-site commercial civil workspace," (2) "utilized an unapproved civil court reporter," (3) "lacked a list of attending grand jurors," and (4) the Indictment did not include "federal certification" or the "signature, stamp, or verification of an authenticated Grand Jury Foreperson." *Id.*[2] The Government responds that there was nothing unusual about the grand jury transcript of the proceedings conducted by an Assistant U.S. Attorney ("AUSA") at the Edward R. Roybal U.S. Courthouse.

As noted in the June 4, 2026, order regarding Defendant's *Ex Parte* Application for Order to Strike Transcript and Dismiss Count 6, Defendant failed to file a motion to dismiss the Indictment for the claimed errors in the grand jury proceedings before trial and did not raise any objection to the lodging of the grand jury transcript *in camera*. Dkt. 374 at 2 (citing Fed. R. Crim. P. 12(b)). Accordingly, Defendant's objections are untimely and have been waived for purposes of appellate review. *See United States v. Kahlon,* 38 F.3d 467, 469 (9th Cir.1994) ("Irregularities in grand jury proceedings are considered to be defects in the institution of the prosecution . . . . Failure to raise such defects before trial results in waiver of the objections."); *see also United States v. Cotton*, 535 U.S. 625, 630 (2022) (indictment defects are not jurisdictional and may be forfeited if not timely raised). Because Defendant waived any challenge to the validity of the Indictment by failing to raise the alleged procedural defects prior to trial, this issue does not raise a "substantial question likely to result in reversal or an order for a new trial." *See Handy*, 761 F.2d at 1280.

Notwithstanding that Defendant has waived his objections, a review of them shows that they are without merit. Pursuant to the Government's representation, the grand jury proceedings occurred at a federal courthouse in this District. Based on a review of the transcript of the July 23, 2021, grand jury proceedings, they were transcribed as required by Federal Rule of Criminal Procedure 6(e). A Certified Shorthand Reporter (CSR) transcribed them. The CSR Examination administered by the Court Reporters Board of California is an acceptable qualifying examination to serve as a court reporter in this District. *See* 28 U.S.C. § 753; Guide to Judiciary Policy, Vol. 12, Ch. 5 § 580.40.30 (2026), https://jnet.ao.dcn/sites/default/files/pdf/Vol12_Ch5.pdf. The certified court reporter duly certified the transcript of the July 23, 2021, grand jury proceedings as required. *See* 28 U.S.C. § 753; Guide to Judiciary Policy, Vol. 6, Ch. 5 § 520.63 (2022), https://www.uscourts.gov/sites/default/files/guide-vol06.pdf.

With respect to Defendant's objection to the "list of attending grand jurors," pursuant to Federal Rules of Criminal Procedure 6(c) and (e), the names of the grand jurors in attendance and "the number of jurors concurring in every indictment" are not made publicly available. Accordingly, no such lists have been provided in this case. There is also no evidence that a quorum of grand jurors did not participate at any point during the grand jury proceedings. Finally, the foreperson of the grand jury signed the Indictment as required by Federal Rule of Criminal Procedure 6(c). *See* Dkt. 1 at 9.

Because Defendant waived the foregoing objections and those objections are without merit,

---

[2] Defendant previously challenged the Indictment on procedural grounds by arguing that the acting U.S. Attorney for the Central District of California at the time was "unconstitutionally seated" pursuant to 28 U.S.C. § 546(c)(2). Dkt. 199. On September 11, 2025, an order issued that denied Defendant's pretrial *Ex Parte* Application to Dismiss the Indictment. Dkt. 227. As detailed on the record of the August 28, 2025, final pretrial conference, Defendant's challenge to the Indictment was denied because the acting U.S. Attorney for the Central District of California was authorized to serve in that position when the grand jury was impaneled.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:21-CR-00335-JAK-1 | Date | July 6, 2026 |
| Title | United States v. Jeffrey Moffatt | | |

Defendant's challenge based on Federal Rule of Criminal Procedure 6 does not raise a "substantial question likely to result in reversal or an order for a new trial." *Handy*, 761 F.2d at 1280.

c) Evidentiary Challenges to Supplemental Sentencing Reports

Defendant next argues that whether the Government could rely upon Exhibits 165 to 177, which he contends do not comply with Federal Rule of Evidence 901, to support its sentencing recommendation raises a substantial question on appeal. Dkt. 381 at 4. The Government responds that none of the challenged documents were admitted at trial; they were numbered as exhibits in the event it became necessary to refresh a witness's recollection at trial.

Exhibits 165 to 177 consist of various OI-4 Reports of Investigation by the Office of the Inspector General of the Social Security Administration ("SSA") concerning the investigation of Defendant's actions as an attorney representing various clients before the SSA. These exhibits were not admitted at trial. Dkt. 320 at 27–28. Therefore, they were not part of the evidence upon which the jury relied to return a guilty verdict on Count 6 of the Indictment. Because Exhibits 165 to 177 were not admitted at trial and, pursuant to Federal Rule of Evidence 1101(d), Rule 901 does not apply to sentencing, regardless of whether these exhibits comply with the requirements of Federal Rule of Evidence 901, the question Defendant raises is unlikely to result in reversal, an order for a new trial or a direction that Defendant be re-sentenced. *See Handy*, 761 F.2d at 1280.

Even if Rule 901 applied to sentencing, there is no evidence that the Government or the U.S. Probation Office relied upon Exhibits 165 to 177 in drafting any sentencing briefing or the Presentence Investigation Report, respectively. *See* Dkts. 346, 351, 366. Accordingly, there is no evidence that those exhibits were relied upon to support the Government's recommended 18-month sentence. *See* Dkt. 351 at 13. Further, Defendant was sentenced to a term less than the Government's recommended 18-month sentence. *See* Dkt. 379 at 1. For these reasons, there is no evidence that evaluating Exhibits 165 to 177's compliance with Federal Rule of Evidence 901 would have resulted in a non-custodial sentence or one of less than the time that would be served by the end of the appeal. *See Baras*, 2014 WL 4728992, at *3.

d) Evidentiary Challenges to Trial Exhibits 1 and 2

Defendant also argues that the admission of Trial Exhibits 1 and 2 pursuant to Federal Rules of Evidence 901 and 902 raises a substantial question on appeal. Dkt. 381 at 4. The Government responds that, because these exhibits were authenticated at trial, their admission does not raise any substantial question on appeal.

Trial Exhibit 1 is a March 7, 2016, Decision and Order Imposing Sanctions by the Arizona Supreme Court. Trial Exhibit 2 is an April 19, 2016, Final Judgment and Order of Disbarment by the Arizona Supreme Court. At the time Trial Exhibits 1 and 2 were admitted into evidence on October 8, 2025, Defendant did not object. *See* Dkt. 320 at 3. They were relevant to the criminal charges presented at the trial*, i.e.*, whether Defendant was authorized to practice law when he represented certain clients in SSA proceedings. As previously held in the June 3, 2026, Order, because Defendant has not presented any new evidence in support of his current evidentiary objection, his objection to Trial Exhibits 1 and 2 has been waived. *See* Dkt. 373; *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir.1996) ("By

failing to object to evidence at trial and request a ruling on such an objection, a party waives the right to raise admissibility issues on appeal."); *see also United States v. Beltran-Carranza*, 227 F. App'x 660, 661 (9th Cir. 2007). Because an objection to the admissibility of Trial Exhibits 1 and 2 is unreviewable on appeal, this challenge does not raise a "substantial question." *See Handy*, 761 F.2d at 1280.

Further, even if this issue were subject to appellate review, it would not raise a substantial question. Pursuant to Federal Rule of Evidence 902(4), a copy of a court record is self-authenticating and "require(s) no extrinsic evidence of authenticity in order to be admitted" if it is "certified as correct by . . . the custodian or another person authorized to make the certification . . . ." Trial Exhibits 1 and 2 each includes a certification executed on September 4, 2025, by the Disciplinary Clerk of the Supreme Court of Arizona that the record is "a full, true, and correct copy of the original on file." Because these exhibits are certified, self-authenticating copies of court filings, they are admissible under Federal Rule of Evidence 902(4). Accordingly, this issue does not raise a substantial question on appeal.

e) Trial Exhibit 59 Challenges Based on Attorney-Client Privilege & the Federal Arbitration Act

Defendant argues that the admission of Trial Exhibit 59, a copy of Defendant's April 27, 2017, retainer agreement with client H.D., presents a substantial question on appeal. Dkt. 381 at 4. He contends that the Government breached the attorney-client privilege of this client by admitting the retainer agreement into evidence. *Id.* at 4–5. He also argues that, because the retainer agreement contains a valid, mandatory arbitration clause, legal proceedings derivative of the agreement were "explicitly bound to private civil arbitration under the Federal Arbitration Act (FAA) . . . ." *Id.* at 5. The Government responds that there was no breach of attorney-client privilege because Defendant submitted the retainer agreement to the SSA himself and it simply memorialized that Defendant purported to be a qualified attorney representing a social security claimant.

Regarding the alleged breach of attorney-client privilege, the Ninth Circuit has repeatedly held retainer agreements are not protected by the attorney-client privilege or work product doctrine. *See Ralls v. United States*, 52 F.3d 223, 225 (9th Cir. 1995); *accord United States v. Blackman*, 72 F.3d 1418, 1424 (9th Cir. 1995) ("As a general rule, client identity and the nature of the fee arrangement between attorney and client are not protected from disclosure by the attorney-client privilege."); *In re Michaelson*, 511 F.2d 882, 888 (9th Cir. 1975) ("[I]t has generally been held that information concerning the fee arrangement between an attorney and his client, or the existence of the attorney-client relationship is not privileged or protected by the attorney-client privilege."); *see also White v. Experian Info. Sols., Inc.*, No. 05-CV-1070, 2010 WL 11526818, at *2–3 (C.D. Cal. Sep. 30, 2010). Communications concerning "the identity of the client, the amount of the fee, the identification of payment by case file name, and the general purpose of the work performed are usually not protected from disclosure by the attorney-client privilege." *Clarke v. Am. Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992); *see also Paul v. Winco Holdings, Inc.*, 249 F.R.D. 643, 654 (D. Idaho Feb. 27, 2008); *Gaines v. Law Office of Patenaude & Felix, A.P.C.*, No. 13-CV-1556, 2014 WL 3894348, at *5 (S.D. Cal. June 12, 2014)). However, "the privilege is invoked where disclosure of the fee-payer/client identity and the fee information would infringe upon a privileged communication." *Ralls*, 52 F.3d at 225–26.

Trial Exhibit 59 revealed Defendant's representation of H.D. before the SSA and the fee arrangement. Accordingly, under the foregoing standards, its disclosure did not infringe upon a privileged

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:21-CR-00335-JAK-1 | Date | July 6, 2026 |
| Title | United States v. Jeffrey Moffatt | | |

communication. Instead, it is within the general rule that the attorney-client privilege does not apply to or protect such agreements from disclosure. *See Ralls*, 52 F.3d at 225–26. Because this is well-established in the law, the applicability of attorney-client privilege to Trial Exhibit 59 raises a "readily answerable" rather than "substantial" question. *Handy*, 761 F.2d at 1281–83.

Defendant's argument regarding arbitration also fails to raise a substantive question on appeal. The FAA applies to:

> [a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal . . . .

9 U.S.C. § 2.

The criminal investigation and subsequent judicial proceedings initiated by the Government against Defendant do not concern any dispute arising out of the retainer agreement. Such disputes would have been between Defendant and a client. Thus, the terms of the retainer agreement between Defendant and H.D. required arbitration only for conflicts between Defendant's law firm and H.D., not third parties. Accordingly, the FAA and arbitration clause do not apply in these proceedings. Because the inapplicability of the arbitration clause is readily ascertainable, this issue also fails to present a substantial question.

* * *

For the foregoing reasons, Defendant has not met his burden to show that his appeal "is not for purpose of delay" and that it raises "a substantial question likely to result in reversal or an order for a new trial." *See Handy*, 761 F.2d at 1280. Accordingly, the Motion is **DENIED**.

## III. Conclusion

For the reasons stated in this Order, the Motion is **DENIED**, and the self-surrender date of September 30, 2026, before 12 noon, which was set at the sentencing hearing, remains in place.

**IT IS SO ORDERED.**

_______ : _______

Initials of Preparer LC2

# EXHIBIT C

A. Yes.
Q. And what rule would it violate?
A. Once an attorney has been disbarred, they're required to immediately disclose their disbarment.
02:10PM Q. And could the failure to immediately disclose the disbarment in and of itself be a reason to disqualify an attorney?
A. Yes.
Q. Now, while a disqualification proceeding is pending,
02:10PM can an attorney continue to represent SSA claimants?
A. Yes.
Q. And that's until a final decision is rendered?
A. Right. Yes.
Q. But during that time, can an attorney continue to
02:10PM make false statements on SSA forms?
A. No.
Q. If the Social Security Administration believed that an attorney wasn't actively representing claimants but had been disbarred, would that affect how quickly or how seriously the
02:11PM Social Security Administration took the disbarment -- the disqualification proceedings?
A. Yes.
Q. And how would that affect it?
A. If -- if an attorney hasn't practiced before the
02:11PM agency, you know, in several years, you know, we typically

A. I've -- I vaguely remember that that was something that was argued, yes.

Q. Okay. Do you remember the GAO report saying that anything -- there was a couple of reports -- that anything with a head of an agency that's not properly appointed, everything that comes down is essentially void or invalid?

A. I'm not familiar with that report.

Q. Okay. Well, now, the interesting thing about this case is there are five dates -- 8/16/2017, 3/8/2019, 3/7/2019, 1/6/2020, and 3/25/2020.

Would you agree that those are all before January 30th, 2024?

A. Yes.

Q. Okay. Now -- so although proceedings started in 2017 that I thought were -- were improper, they didn't end until 2024.

A. Yes.

Q. Okay. So it was your position that, as long as something's on appeal, that one can still practice; is that correct?

A. That's what the Social Security regulations --

Q. Okay. So being charged for -- for receiving five checks when I'm still in the appeal process, you would see that as improper, wouldn't you?

MR. LACHMAN: Objection, Your Honor. Calls for a

legal conclusion.

THE COURT: Sustained as framed.

MR. MOFFATT: Your Honor, I -- I'd file a motion to dismiss all five of these counts.

02:35PM THE COURT: Please -- please restate the question.

BY MR. MOFFATT:

Q. Okay. Given their -- the five counts that are against me are before January 30th, 2024, I was still admitted to practice until that date in Social Security; correct?

02:36PM A. You were still admitted to practice before that date, yes.

Q. Okay. Thank you very much.

Now, some of the things that I brought up in my case is I didn't want to be in front of an administrative law judge. 02:36PM Do you recall that?

A. I don't recall that.

Q. Okay. Do you remember me making a motion to transfer the case to Federal Court?

A. I'm vaguely familiar. There was an attempt to 02:36PM remove the case to Federal Court.

Q. Okay. Are you familiar that, since this case started, that -- that under several different legal doctrines, do you -- you can go outside of the -- an administrative agency and you can go into Federal Court? You're familiar with that?

02:37PM A. I'm not familiar with that.

02:37PM THE COURT: While we're waiting for the alternate juror, Ms. Chandran and Mr. Lachman, I have a question.

In light of the arguments that have been advanced by Mr. Moffatt with respect to his -- his contention that it was his ongoing right to act as a representative while an investigation -- until an investigation was concluded, my question is this.

02:38PM If a -- an attorney were to check the box that identifies having been disbarred and if an investigation is opened, what -- and the -- and, first, is the attorney permitted to continue to represent claimants before the Social Security Administration?

02:38PM MR. LACHMAN: Your Honor, consistent with the testimony yesterday, an attorney may continue to practice before the Social Security Administration until they are disqualified. But it is the Government's contention in this case that Mr. Moffatt knowingly and intentionally checked the box that said he was not disbarred. So --

THE COURT: I understand. That's not my --

02:38PM MR. LACHMAN: Yes.

THE COURT: Just a minute.

02:39PM So my next question is: If an attorney checks the box that says has been disbarred and an investigation is commenced but not concluded and if it -- is the -- if the -- if the -- if the attorney is -- is the -- are there circumstances

under which the Social Security Administration would continue to permit that attorney to represent claimants before the SSA while the investigation is ongoing?

MR. LACHMAN: Yes, Your Honor. The attorney can continue until they are disqualified -- until both the investigation has been concluded and a decision has been rendered through final appeal, the attorney can continue to represent SSA claimants.

THE COURT: Okay. Then my next question is this: During the -- during that -- during the period that you just identified between -- where the investigation has not been concluded, is the attorney paid by the SSA for work that the attorney performs on behalf of claimants?

MR. LACHMAN: It's a very similar answer. Until the attorney is finally disqualified, the attorney will get paid, even if the attorney has been disbarred, until their final disqualification.

THE COURT: In this matter where the Government alleges that there was a failure to check the box by Mr. Moffatt stating had been disbarred, if the box had been checked -- if the box had been checked and then there was a subsequent investigation opened and the -- and there was ongoing representation, would there -- what is the basis, then, for the -- for the claim that the amounts that were paid between the disbarment -- following the disbarment constituted

fraudulent payments if they would have been made, hypothetically, had an investigation been pending?

MR. LACHMAN: So I think there are several things wrapped into that question.

02:41PM If -- under the Social Security rules, as we heard yesterday, Mr. Moffatt was required to notify the Social Security Administration immediately upon his disbarment. He did not do so, and he hid that fact from the Social Security Administration.

02:41PM So if he had done that, there would have been disbarment proceedings that would have commenced immediately -- sorry -- disqualification proceedings.

Secondly, Mr. Moffatt, we heard yesterday, had an obligation to be truthful and forthright with the Social 02:41PM Security Administration. And that included filing an explanation of the reasons, the circumstances for his disbarment.

And if he had been truthful then and said I was disbarred and I -- from the State Bar of Arizona and I was 02:42PM disbarred because of misconduct, it would have been an admission that would have facilitated the prompt disqualification of Mr. Moffatt. But, instead, what happened in this case is Mr. Moffatt lied and hid the fact of his disbarment from the Social Security Administration.

02:42PM THE COURT: So is the -- is the Government's -- is

the Government's wire fraud claim premised on what you've just stated, meaning that the Government would have to show beyond a reasonable doubt that, had there been a disclosure upon the -- upon the disbarment, that there would have been a conclusion of the disqualification process --

MR. LACHMAN: No, Your Honor.

THE COURT: -- before -- excuse me.

MR. LACHMAN: Oh, sorry.

THE COURT: -- prior to the -- to some or all of the payments that are at issue in the wire fraud?

MR. LACHMAN: No, Your Honor. That is not the standard under the element of materiality in the wire fraud charge.

The -- what the Government needs to show is that his false statement was material to the Social Security Administration in that it had the capability of influencing the Social Security Administration's decision to part with money or property.

In this case, it was material because hiding the fact of his disbarment and the fact that he was disbarred for misconduct would have led and, in fact, did lead to his disqualification.

Knowing that he was disbarred would have caused them to commence disqualification proceedings, and those proceedings -- the Government does not have to show that those

proceedings necessarily would have concluded before the payment. The Government just has to show that they were important to the Social Security's decision to seek disqualification.

02:44PM THE COURT: All right. I understand your position. Thank you.

MR. MOFFATT: May I respond, Your Honor?

THE COURT: Yes, you may.

MR. MOFFATT: Okay. Now, if you look at

02:44PM Exhibit 137, it has a -- on the second page -- and this -- Mr. Lachman's saying I'm dishonest. I truly take offense to that. You'll look at the Docket Number RS 1703. So that shows -- that's their Exhibit 137, page 2.

So Mr. Lachman's contention that Social Security was

02:44PM not aware of my disbarment, they started the process in 2017. On top of that, I had a -- a case in Federal Court and have a continued case in Federal Court regarding the disbarment. And I was trying to move the case, that administrative matter, into Federal Court. So that was active.

02:45PM So the fact that Mr. Lachman said I'm -- I was deceiving Social Security, I'm suing them. I'm doing a whistleblower complaint. And the thing starts in 2017, doesn't end until '24.

And if you also look, Your Honor, on my document

02:45PM that -- that I filed the ex parte motion to dismiss that you

said you'll rule on it later, if you look on page 6, 20 CFR 404-1705(a), qualifications as an attorney. Now, it talks about that they have the -- the ability to continue representing if you were challenging the disbarment.

02:46PM So the -- the fact that Mr. Lachman, he agrees with the witness, that I had the ability to practice but -- and I had the ability to earn money, but now he's trying to flip it on its head and say but I was dishonest with the State Bar because they just found out about it and they didn't finish it

02:46PM up till 2024, that was a process that I had the ability to -- to continue practicing and to continue earning money. And I -- and the fact that I was -- I was challenging --

THE COURT: I understand.

MR. MOFFATT: -- in Federal Court the disbarment,

02:46PM that satisfies that statute there.

THE COURT: I understand your positions. This is an issue that I will address in connection with the motion, when it's renewed -- if it's renewed.

MR. MOFFATT: Okay. All right.

02:50PM (Pause in the proceedings.)

THE COURT: Agent Ibarra, could you retake the witness stand.

(In the presence of the jury:)

THE COURT: All of our jurors are back.

03:03PM Welcome back. I'm so sorry we kept you waiting. We